Good morning. Good morning Judge Collin, Judge Shepard, Judge Strauss. May it please the court. Charlie and Anita Waters state constitutional claims that require this Court of Appeals for the Eighth Circuit to reverse the district court and remand the matter for further proceedings in the United States District Court for Minnesota. As a preliminary note, Your Honors, the Waters settled their companion claims against Menard, Inc. on the basis of Perringer and Fry against Snellgrove, the Minnesota case that took Perringer. Your Honor, this is a case of a warrantless seizure on a possible alleged misdemeanor of shoplifting, a non-violent offense under Minnesota statutes. I direct the Court's attention not only to the Fourth Amendment case law of the of this circuit, particularly Keel against Burtis and El-Ghazali against Bertiam, but I also direct the Court's attention to Minnesota Statute section 629.366 and that is the shoplifter's net. Why is that relevant if the question is under the Fourth Amendment? Your Honor, it's relevant under the Fourth Amendment because this narrowly prescribes what a law enforcement officer may do. Aren't there other crimes in Minnesota though that can be charged without regard to that specific statute? Oh yes, Your Honor, yes. So if they had reason to believe this thief was stealing something in his trunk, there would be basis to hold him even if it didn't violate the statute you're describing, right? Your Honor, if they had set forth a probable cause that he had taken something from another location, another merchant, or from the lumber yard, something you didn't purchase. Your Honor, 629.366 would govern the situation at Menards. The exclusive basis under Minnesota law to prosecute someone for stealing from a store? Your Honor, this is, let me put it to you, the short answer to the question is yes with this qualification that 629.366 governs what a merchant and what law enforcement officers may do in the face of a potential shoplifting situation. You don't have a cause of action under that statute. Your claim is there was a Fourth Amendment violation. Yes indeed, Your Honor. Let me clarify. I'm only making the suspicion that he violated any statute. Presumably they could seize him under under Terry. Well, under Terry for the Fourth Amendment, let me let me clarify something that that 629.366 is more relevant for the common law claims. They start, we start with the Fourth Amendment analysis, yes, you start with you start with a Terry stop, okay? If there's a suspicion of anything afoot, okay? And so wasn't there enough here from the officer's perspective, not from the perspective of Mr. Waters, if the officers knew that there was signage, open and obvious signage, that says a person consents to opening the trunk and then the person refuses to open the trunk, why doesn't that at least raise a person is trying to take something out. Well, Your Honor, the reasonable suspicion for an offense and Mr. Waters is asserting his constitutional right and he is simply saying, look, if you if you want a warrant, go get a warrant. When when the officers arrive, what can what can they do with a starting with Terry and going to the Fourth Amendment? They have a they have an aegis that protects them. Number one, they look, they can talk to witnesses on the scene, they can take whatever they know from Mr. Waters' 911 call, they can take into consideration anything that they have in plain view and they have three choices. One, they can arrest. Two, they can get a warrant. Three, they can let them, they can let people go. They cannot prolong a seizure under the Fourth Amendment just to coerce an individual to do something that they otherwise could not do. What we have, Your Honor, on the video and audio is that first, Mr. Waters produced the receipt for the the merchandise. He showed it at 3020. The Menards employee said thank you. At 3921, it was Officer Newbery, I think who's been married since, said I don't have, I get reasonable suspicion just for not, just because you didn't open the trunk. At 4020, Kirchner states, yeah, you can prove your payment, but there's, you're not proof of anything that you don't have anything else. I mean, he's trying to prove a negative, trying to make him prove a negative. He could have something that is perfectly valid, there's no there's no basis for, there's no objective basis for saying that he's been, he's been shoplifting under the statute. Nobody in Menards has told any of the officers. We think that he's shoplifted X. He's given the whole point of their, of their rule about opening the trunk to prevent shoplifting. The rule of their, that, that signage is questionable. It's not a, it's a questionable validity and that may, one, we have a case from Iowa and B, we have the Paringer, Paringer case. We have the Paringer release, Your Honor. So, what happens then? Okay, Mr. Officer Newbery asserts, I can go get, I can go get a gun. He says, go get one. She doesn't get one. At 4029, we have Officer Kirchner saying what this is all about. It's not about suspicion that you've broken the law. It's not suspicion that you have something that you haven't returned. It's just Menards' policy and that's not a good enough reason under the Fourth Amendment. It certainly isn't a good enough reason under the plain words of Minnesota's shoplifter statute. So, following that, at 4224, we have Officer Kirchner struggling to get on the cuffs, get, get the cuffs off her utility belt. At 4101, we have Mr. Waters demanding the officer's names and badges, which he can do. Okay, what happens? We've read the facts. I understand. I'm just. What's your guess? That, that the officers crossed the fourth, a clearly established Fourth Amendment line by prolonging the, the search by coercing, coercing Mrs. Waters saying, listen, if you don't open the, open this trunk, you're not going to go home with your husband. And by that point, they were attempting to coerce her into giving up rights without, without any supporting evidence and by prolonging the search. That you can't do under El-Ghazali. That you can't do under Keel against Burtis. And under Minnesota law, resting on the, on the Fourth Amendment, under Askeruth, you can't incrementally increase the search without additional probable cause. What, what suffices for reasonable suspicion doesn't suffice for I didn't understand the district court to have said there was probable cause. And, and holding that there was a reasonable suspicion or arguable, reasonable suspicion for the, that's not a tension of Mr. Waters. And then there was consent by the wife to opening the trunk. Your Honor, there was, uh, the, what, what, excuse me, they needed probable cause to continue to first to handcuff and to detain Mr. Waters. And they needed probable cause to get into the trunk. And why did they need more than reasonable suspicion to temporarily detain Mr. Waters in the car? Okay. They could temporarily detain, but to handcuff him, Your Honor, we have a, a 2011 Eighth Circuit case, El-Ghazali that says you can handcuff him if you have suspicion that he's dangerous. If he has acted out in a, in a fashion that, uh, handcuffs may be appropriate. We don't have any of that, uh, circumstance, uh, present. You don't think he acted out there? I mean, look, he, he didn't act probably dangerously, but, but he certainly resisted, uh, resisted what, not in the sense of physically resisting, but he resisted what the officers were telling him and what the Menards employees were telling him. That doesn't, that doesn't, uh, get you there? He's, uh, it, it does not get us there, Your Honor, under, uh, Houston against Hill and against, under Gaynor against Rogers, Keele against Burtis and, uh, Copeland against Locke. He's speaking. He's, he's not swearing. He's asserting a right. And, and this court has found that it's not, that you don't have enough reasonable suspicion by just asserting a right. That was actually Florida against Bostic, which was a, a Supreme Court decision. So what, uh, we also have, uh, cases that after briefing, we had, uh, the Eighth Circuit decided Ross against city of Jackson and, uh, Johnson against the city of Minneapolis, you know, saying what's necessary for, uh, arguable, reasonable, arguable, probable cause to detain. And you keep going to probable cause when I thought the question is why isn't this just a Terry stop? It's not a Terry stop because it was prolonged. He was, how long was he detained? Uh, Your Honor, it appears that he was detained about, uh, about 12 minutes, according to the, don't we have plenty of Terry stop cases that go beyond 12 minutes? We don't, uh, Your, Your Honor, we have Terry stop cases that may go on beyond 12 minutes, but we have a, we have a case where this is the case of coercion where they could have got where they did not get a warrant, but coerced Mrs. Waters to, to get to a separate issue from whether they violated the rights of Mr. Waters by detaining him for 12 minutes. Right. I mean, he's just challenging a seizure. He doesn't have standing to challenge. Yeah. He's got challenges. Mrs. Waters was, uh, he has standing to chat. Okay. I don't know. Are you talking about a challenge? I've got five. I've got five minutes for like to save it. Uh, Your Honor, I do want to save it, but just to say this, this quickly, that Georgia against Randolph, uh, is a case where you don't have, or if one, one person who's got the power says no. If the other one present says yes, the, the officers can't get in and I'll save the rest of my time. Thank you, Your Honor. Okay. Very well, Mr. Zip. We'll hear from you. Okay. May it please the court. Counsel. I'm Ryan Zip. You're representing the Coon Rapids police officers in the city of Coon Rapids. I'll generally refer to the, uh, a police as the Coon Rapids police officers, unless I'm talking specific officer. This court should affirm the dismissal of the plaintiff's amended complaint because one, the Coon Rapids police officers acted reasonably and within their constitutional authority in conducting an investigation of a shoplifting allegation at the Menards in Coon Rapids, Minnesota. First appellant's amended complaint failed to say plausible claims of constitutional rights. Second, plaintiff failed to meet their burden of establishing that the Coon Rapids officers violated clearly established law to defeat the application of qualified immunity. And finally, the appellants have failed to state claims, um, under Minnesota state law. Could you address the search of the trunk? Yes, Your Honor. And why that didn't violate the fourth amendment? Uh, it did not violate the fourth amendment because they received consent from, um, Mrs Waters. And if you look at the circumstances and really the material facts are on dispute in the sense of we have, um, squad video and audio. We have, um, radio and audio from Mr Waters. The concern is the coercion argument that they told her you're not going home until you open the trunk. Is that really then a valid consent? A reasonable officer could think it's a valid consent. What do you think about that? Yeah, I don't. I don't think that's exactly what was said. I don't think those words were exactly what was said. But again, the issue is not whether the individual wasn't that what she alleged was said. I believe in listening to the to the audio recordings. I don't think that's exactly what do you think was said? I think it was more along the lines of is more along the lines of for us to get out of here and to get going. Um, if you could just please let these gentlemen look, look inside the trunk. And again, I think if we go back, okay, if we, if we go to, if we go to a state fee Walker and again, if you look at the circumstances, it's a multi pronged test. It's a balancing test. And if you look at the conduct, the way the officers performed, um, they were very calm. They're respectful. It was very conversational when the officers initially approached Mrs Waters and asked, Hey, what's going on with your going on? Um, the wife is kind of acknowledging. Yeah, you take stuff seriously. He kind of gets himself in the situation. Um, and again, the is very conversational. There wasn't any threats. There wasn't any. Um, um, she wasn't handcuffed. She was allowed to stay in her car. Um, under those circumstances again, if we apply and look at in comparison to state fee here, um, in this case, the safety Walker, the court clearly looked at in that case and said, under those circumstances, the officers are entitled to qualified immunity under circumstances in which arguably in a safety Walker, the conduct was a lot more. What about the fact that her, that her husband was handcuffed at the time? Does that, does that make it more coercive? It's a factor that is a factor to be considered. And again, the inherent, the inherent situation which you're in a seizure and police are talking with you, there's a show of force. I mean, but simply because the husband's handcuffed and, and there are, there is case law out there that talks about if, for example, they went to Charles waters and asked him, can you open up the trunk? Um, the fact that he's handcuffed and detained does not invalidate the consensual. Let me ask you this. I actually have a different concern I think than judge Colleton, which is the Georgia versus Randolph concern. So the way I understand the timeline is, is Mr. What about that too? Yeah. Um, the Mr, that Mr. Waters says no. And when he's asked and then later on they asked Mrs. Waters and she says yes. And at least in the context of a home that doesn't work in the context of a home that doesn't work. And I think you kind of hit the point your honor. And there's, and there's actually multiple grounds why the court shouldn't even consider the Georgia v Randolph line of questioning. Number one plant didn't raise this before the district court. And, and had it been raised for the district court, it would have been addressed. Number two, the plaintiff or the appellant did not raise it in their opening brief. So we certainly didn't get, have an opportunity to respond to it. The first time this shows up is in the reply brief. The first time there's any mention of Georgia, Georgia v Randolph and that whole, that whole line of cases. So it didn't show up in the, in the, in the district court. This is, it's, here's the first time. First time is on reply. First time is on reply. The other thing too, if you look at a circuit case law, USV Lumpkin in looking at it has, has come back and said, we don't, we don't think that Georgia v Randolph is intended to extend to automobiles. We think it's strictly limited to residents. And at this point, plaintiff or appellant didn't show clearly established law to say a Georgia v Randolph is, is now at automobiles. So therefore, simply because one person is detained in the squad car, you don't get to ask the other person, can I, can I open your trunk? And again, the other part, and there's a little bit deeper analysis. Is the idea of that case you were talking about is the idea that automobiles are different. For example, we have the automobile exception where you can search a trunk with just probable cause, but don't have to get a warrant. Is that the idea behind not extending it to a car or a? It's, it's a different, it's, it's, you know, there's greater protections for houses and residences as opposed to protections for automobiles. And, and again, Fernandez v California, that's, that's another case where the Supreme Court looked at it and, and kind of made that distinction between if somebody's detained and, and in a way it's as if they're the absent person, even if, let's say five minutes earlier, they're saying, I don't want you to search my trunk. If they're detained and that somebody else has asked a, you know, can we open up your trunk? Um, I would also say Fernandez v California also backs up our position. The one argument we didn't make, and, and I think I, when you look at what the officers did in this case, they were, in my opinion, they're very remarkably restrained. They didn't immediately go to when they first confronted Mr. Waters and he said, I'm not going to open my trunk. They didn't immediately say, okay, you're under arrest, open your trunk. And in the sense of going straight up to probable cause, they went through the analysis and the reasonable suspicion in the sense of, um, they were going to do the investigation. They're going to determine, is there any evidence to say there's something in the trunk before they went to the next step, which we never had to cross that bridge. We never had to cross the bridge of the automobile exception because they first went to Mrs. Waters and said, you know, Mrs. Waters, would you show these gentlemen what you purchase? Um, you know, to get consent, they didn't have to cross the next bridge of, okay, do we, are we going, you know, from arguable reasonable suspicion, which is a much lower level, they didn't have to go up to the next level of arguable probable cause to then get into the trunk. So they were remarkably restrained in how they went about this particular stuff. I wanted to ask you about real quickly about the handcuffing, um, and the Al-Ghazali case. Um, you know, one of the problems I'm having here is, is he wasn't handcuffed because he had a weapon or was otherwise dangerous. Um, he wasn't, he wasn't handcuffed because they thought, you know, they thought he might become dangerous or he was actively resisting arrest. What do we, and he wasn't arrested at all. What do we make of that? And what do we do with the Al-Ghazali case? I think Al-Ghazali is very distinctive or is distinguishable. I think when you look at this case, a couple of factors that come into play. One is he's in a vehicle, which in and of itself does pose a threat of somebody being able to accelerate a vehicle and taking off. Um, the conduct of Mr. Waters, he was argumentative. Um, he was not cooperative. Uh, he wanted to basically, he was there to pick a fight is really what he was there for when he watched the video. Uh, he disobeys multiple commands to the officers, step out of the vehicle, step out of the vehicle. That's asked multiple times. He keeps on, he keeps on, um, disobeying it. The other thing too, is he refuses to identify himself. Um, you know, officers during a, during a Terry stop can ask, you know, can you identify yourself? Can you give me some identification? The failure to do so is going to raise concerns for an officer. Is that number one, you know, is there a warrant on this person? I'm not aware of that. If we ran his name, there's something more serious out there. Um, does he have a history of criminal violence? You know, the other op, the other thing is, is this a here, a serial shoplifter that, okay, now it explains why he's making a big deal about it because he got caught. Um, so the fact that he's not providing his name just kind of raises the concern for the, for the officers. And again, refusing to open the trunk. The heightened concern is, is there something in there? Is there contraband in there? Is there a weapon in there? Is there some reason why he doesn't want us getting that trunk? Is there, you know, I'm not gonna leave him in this, in his passenger vehicle, turn my back and the next thing you'll see him in the trunk. Although there, there, there wouldn't be, I mean, even if there was a gun or a weapon in there, he wouldn't be able to get at it. So the dangerousness part of it, of the Terry stop probably wasn't in play unless I'm missing something from these facts. No, I mean, certainly there's gonna, there's gonna be a time period. I mean, steps out of the car, he walks there and there's, there's three other officers there. They're gonna spot it. They're gonna see it. They're gonna tell him, but, but he's already been disobeying commands already. There's an unpredictable nature to it when they're saying, step out of your car, step out of your car. He's disobeying it. They have to say it repeatedly. There, there's some unpredictable conduct. The distinction I'll make with Al-Ghazali is that in Al-Ghazali, the officer showed up on a, on an allegation of, trying to remember the allegation, I think it was, I think it was at a, at a pawn shop. The officer immediately handcuffed Al-Ghazali. I mean, before any conversation, before any discussion, they just immediately went straight to handcuffing, handcuffing him. The record shows he was calm. He was cooperative. There was nothing in Al-Ghazali to indicate that he was going to be difficult, that he was going to pose a threat. I think that's the distinction between Al-Ghazali and, and the Waters case here. And, and the reality is, again, in analyzing based on qualified immunity. Plaintiff didn't, a repellent didn't come back, aside from Al-Ghazali, didn't come back with another case to say, hey, here's another case in which it was, it was, courts have held, that's unconstitutional for you handcuffing someone under this circumstance. There is nothing there to put an officer on notice, or no case law identified, putting an officer on notice that you should have known you couldn't have handcuffed him under these circumstances. So, what basis did they have, how would you state the basis they had to believe he might have been shoplifting? Um, I would say just kind of common sense, in the sense of. You can't just go to a store, you know, and find somebody in the parking lot and say, open the trunk, and they won't open the trunk and say, well now we think you might be shoplifting. Yeah. That's, what's the basis here? The distinction is, is that you have somebody going to Menards Lumberyard, where signs clearly marked as you're pulling into the lumberyard, that on your exit, we're going to ask you to pop the trunk so we can make sure that what you're taking out of our lumberyard is what you purchased. So the signage is key to this thing. Signage is key. Whether that's a valid, whether the store can do that or not, you're saying from the police perspective. I think from the police perspective, and I think if you listen to one of the officers she talked about, she says, when I go to Menards, I open my trunk. And I think, you know. Who said What's that, what's that got to do with it? That has to do with what's a reasonable expectation. I mean, what's the reasonable expectation of society in that, when I go to Menards and I go behind there, I know I'm gonna open the trunk. As you watch the video of this, of this stop, you know, Mr. Waters didn't shut down the exit. There are people still exiting the area, because again, under these circumstances, people know that if you're gonna enter into a lumberyard with a sign clearly marked saying you're, you know, you're gonna open your trunk to Menards, that that's something that they're gonna do. And that's what, again, going back to kind of what is objective, what's a reasonable objective expectation of privacy and a subjective expectation of privacy. And again, he's in a lumberyard, large area, many things could be concealed in the that, that Mr. Waters refused to open his trunk. Again, an officer can make a reasonable inference that you just drove into a lumberyard where the sign said we're gonna open your trunk as you exit, and immediately starts objecting to Menards entering into the trunk. An officer can make a reasonable inference that, okay, there's, there's reasonable, arguable reasonable suspicion that he may be committing criminal activity. . hit .    I had some      highlight the place of hesitancy and contrast and resistance . I cannot permit the procurator say that . They did not raise that on appeal as that being excessive force. The only thing they raised on appeal was the issue of doing the turn and the push of waters when it started to get within arm's length. So actually on appeal our position as it relates to the handcuffing is they did not appeal that issue. Well, I don't know. Their statement of the issue number six is whether the district court, well, it says count 12 but maybe that's not the same count because this refers to false imprisonment. We'll have to check that. Thank you for your argument. Mr. Nikitas, you may appear in rebuttal. Thank you, Judge Collin. I wish to respond to Judge Shepard's last point very quickly and it addresses the issues of coercion. I direct the court's attention to pages 23 and 24 of the principle brief and their reference to page ECF 55 appellant 19, page 9 of 21. The district court did find, quote, the court thus cannot conclude on a motion to dismiss that Mrs. Waters voluntarily consented to open plaintiff's trunk. Now, here we assert the following, that the court erred in failing to acknowledge Mrs. Waters with her husband did indeed plead emotional distress for this constitutional violation in excess of $75,000 or whatever a jury would bear. And that's at ECF 28 appendix 50, paragraph 155. As to the point about identification, Mr. Waters was the individual who called the police and summoned them to the scene. Identification was not a problem. Counsel, I want to talk to you, and I meant to do this in the opening session, which is the Al-Ghazali thing. There you have a handcuffing that was done, and there didn't seem to be a reason for it. The suspect there was completely compliant. There was no danger. Here, as mentioned, your client wouldn't identify himself, and he was being resistant. He was speaking, but he was being resistant. Does that make a difference that we don't have clearly established law here? He clears rule 12, and rule 56, he would have survived that as well. You don't have to produce ID to a cop in Minnesota. I guess what I'm getting at is whether this is different enough that an officer wouldn't know there's a clearly established right here. It would be different enough under Minnesota law and the Fourth Amendment. In the shoplifting cases, there was a distinction made between having a handbag, but they couldn't get into a car. This unpublished decision actually cited a published decision and the shimmel against California case. The Minnesota Supreme Court case was GM  1997. Whatever you can reach, an automobile, that's different. I'm not so interested in the automobile. I'm more    I'm more interested in the police. Maybe it's a concession, maybe it's not, but this is different from Al Ghazali. The facts are different because Al Ghazali was handcuffed immediately. There was something different. He was asserting by spoken word and laboring under his Asperger's condition which Mrs. Waters disclosed to the officers, but he was still being peaceful. Thank you for letting me go a little bit further. That itinerant preacher seemed a little different or maybe clearly out of the ordinary to Officer Rogers, but Gaynor survived qualified immunity at rule 56 stage. We've stated claims for the purposes of rule 12, and the Court should reverse and remand for further proceedings before the District Court. Thank you for allowing me a little over time. Thank you,